[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for termination of parental rights instituted by the Department of Children and Families (DCF) on May 9, 1996 at the Superior Court for Juvenile Matters in Willimantic and subsequently transferred to the Child Protection Session in Middletown for trial. The biological parents of the child have moved as of August 1995 to the state of Florida. They were served by registered mail, return receipt requested. Return receipts are in the file purportedly bearing the signature of Thomas O. on both return receipts. Dawn O., his wife and the child's mother, appeared in Connecticut for the trial and was represented by counsel. She indicated that her husband remained in Florida to take care of his two children by a prior marriage. The court is satisfied that he has received notice of the pendency of this proceeding and no doubt is aware that his wife is in Connecticut to personally contest the action for CT Page 7620 termination of parental rights.
FACTUAL FINDINGS
The court makes the following factual findings. The minor child, Eric, was born on January 1, 1990. He lived with his parents in Florida until they moved to Connecticut. This matter came first to the attention of DCF on March 31, 1995 when Dr. Lee, a Willimantic, Connecticut pediatrician made an at-risk referral regarding Eric's family. Dr. Lee had admitted Eric to the Windham Community Hospital. The child, then 5 years of age, had been encopretic since birth, that is, he was unable to control the discharge of feces. Dr. Lee also noted the child's speech and development were delayed and that the anal sphincter muscle was wide open with lacerations which appear to have healed. Dr. Lee also noted that the child's mother was depressed and unhappy. Because of the possibility of sexual abuse, Dr. Lee notified DCF. The social worker went to the hospital on April 4th and learned the following information from Eric's mother.
On March 25, 1995 there had been a domestic violence incident at the parent's home in Jewett City, Connecticut. Mrs. O indicated that her husband had been drinking, that he wanted her to go into the bedroom and she was screaming. A neighbor called the police and Mr. O was arrested. Mrs. O further indicated to the DCF worker that her husband had been sexually, verbally and physically abusive to her for the past five years. She indicated that she had left him the previous December because he was physically abusive to her. At the present time she and Eric were staying in a shelter for battered women.
Mrs. O indicated that her husband had been abusive to her over the years and this usually occurred on weekends, and it always occurred after he was drinking. Mrs. O indicated her husband would call her a slob and lazy. She indicated that her husband would hold a knife to her neck or caress her with the knife or threaten to cut off her nipples. He would tie her hands behind her back, threaten her with a knife, take her clothes off and then have sex with her. She indicated that her son Eric slept in the bedroom on a mattress on the floor and occasionally would wake up and see her crying, tied up, with no clothes on. Mrs. O indicated at this time she had no intention of going back to her husband.
With respect to Eric's wide-open sphincter muscle, Mrs. O CT Page 7621 indicated that she had never really examined his bottom that closely even though Eric had never been able to control his bowels, according to his mother.
During the time that Mrs. O and Eric were at the domestic violence shelter, the staff were concerned that Mrs. O was unable to care for Eric. They indicated that Eric would be wearing the same clothes, that they would have to direct Mrs. O to bathe Eric and to change his clothes. The staff indicated that Eric's diapers smelled badly and were left on for extensive periods of time. Mrs. O would feed Eric by putting a box of dry cereal on the table and a bowl and tell him to eat when he was hungry. On one evening the staff heard Eric crying in bed because he was hungry and Mrs. O yelled for him to shut up and go to sleep. Mrs. Alba Sostree, the shelter worker, noted that Eric would hug the people on the shelter staff regularly but did not hug his mother. They noted no affectionate play or cuddling by mother to son. Subsequently the domestic violence shelter coordinator contacted DCF and indicated they would not allow Mrs. O to remain in the shelter because of their concern that she was unable to care properly for her son and because of the pervasive odor.
On April 11, 1995 the child was taken to Hartford Hospital and examined. The doctor examined Eric and indicated that Eric has an anatomically abnormal anus; what looked like lacerations were actually the anus folded back on itself. The findings were not clear. One possibility could be chronic sexual abuse, another could be a muscle disease known as myotonic dystrophy, an inherited disease that the mother has.
On subsequent interviews of Mrs. O, it was determined that she had been sexually abused when she was six years old by her father who was subsequently arrested and imprisoned. She indicated that the only time that her husband abuses her is after he has been drinking. She indicated that Mr. O will watch pornographic movies and then be sexually abusive and violent. Mrs. O stated that her husband belittled her and screamed at her in front of the children and that Eric has seen a lot of the abuse. Mrs. O indicates that it was not her who called the police but rather a neighbor and that she probably would not have left Mr. O if the neighbor had not called the police. Mrs. O indicates that she has never been on her own before and that she does not know if she can handle being on her own. She was subsequently moved to the Holy Family Shelter in Willimantic. CT Page 7622
DCF arranged for her to contact the Health First Clinic and schedule an appointment for a physical for herself as well as to a follow-up visit at the Windham Community Memorial Hospital for Eric. DCF also arranged for her to apply for AFDC, Title XIX and food stamps. Mrs. O was also to go to an appointment at United Services for counseling.
Subsequently the social worker learned from the Holy Family Shelter that the mother was not keeping her room clean and was not changing Eric's diapers as often as necessary, which produced a smell in the entire shelter. Mrs. O signed an agreement with the DCF to keep her room clean and to change Eric's diapers regularly. Also she was to avoid any contact with Mr. O and not permit Mr. O to have any contact with Eric. There was a no-contact court restraining order preventing any contact between the two and there was a rule of the shelter that Mrs. O was not to disclose the address to Mr. O. It became clear, however, to staff workers that Mr. O would come to the shelter, pick her and Eric up in his car and return them later in the afternoon.
On May 30, the social worker learned that Mrs. O intended to move back to Jewett City and live with her friend. Mrs. O announced she was one month pregnant. The shelter was considering discharging Mrs. O because of the smells from her room and that Eric smelled of urine and feces constantly. Subsequently Mrs. O's aunt convinced her to return to the shelter since she was not going to permit her to live with her in Jewett City.
Fearful that Mrs. O would return to her husband with Eric, the Department filed a petition for neglect on May 31, 1995. While the child remained with his mother during that period, the Department subsequently invoked a 96-hour hold on the child on August 5, 1995, when the Department learned of mother's plan to reunify with Eric's father and to leave the state of Connecticut to join Mr. O in Florida. On August 7, Mrs. O called the Department, demanding a return of her child and when told of the court proceedings, she became irritated and hung up. The Department did not hear from her again until August 22, 1995, when she indicated that she was living in the state of Florida, now apparently with her husband and his two children from a prior marriage.
Mr. O, the child's father, has not seen the child in over one year. The mother has seen the child only once when she returned to Connecticut in May 1996. At the time of Mrs. O's unexpected CT Page 7623 return, she attended a case status conference at the Superior Court for Juvenile Matters in Willimantic, where she also agreed to submit to a psychological evaluation by Dr. David Mantell.
The psychological evaluation occurred at the office of Dr. Mantell on June 3, 1996. Eric had not seen his mother in approximately ten months and was brought to the interview by his foster father. Dr. Mantell indicated that there was no joy for the child during the joint interview with his mother. "I saw a great distance between the mother and son, one that I took to reflect complete estrangement. There was no touching or embrace. The mother asked questions as if she and the child had not seen one another for so long that they were now completely out of touch. The mother took a picture of the child who was passively and avoidantly compliant."
Mrs. O reports that her father was an alcoholic. She reports her mother and possibly the maternal grandmother have had nervous breakdowns. She herself used drugs at age 18, her first husband used them continually, and her present husband did drugs as a teenager. According to Dr. Mantell's report. She further reports that she was molested by her own father at age 6 and this occurred for approximately one year. The father was subsequently arrested and imprisoned and she reports that her first husband was sexually molested in his childhood by a grandparent. Mrs. O indicates that her husband never changed Eric's diaper, never gave him a bath, never disciplined him or cared for him. It was her duty to care for the children. She does not believe that any of her children ever have been physically, sexually or emotionally abused by anyone and that none of her children have been neglected.
The father of Eric, Thomas O, has successfully avoided any evaluation. The information regarding Mr. O is limited. His wife provided some information and sketchy information is contained in a home study that was done in Florida by a Children and Families counselor from the State of Florida. According to Mrs. O, Thomas was born on September 3, 1954 in Long Island, New York, graduated from high school, and entered the Air Force for approximately two years. He has been married twice previously, once from 1972 to 1979, and a second marriage from 1980 to 1993. In 1993 Dawn married Thomas and there is one son from this union, Eric. Mr. O has one son and one daughter from his first marriage and one son and one daughter from his second marriage. The home study from Florida reports that Mr. O is working as a security guard for CT Page 7624 $250 per week. The counselor was not able to observe Mr. O because at the time of the visit, the father was sleeping and "unavailable to interview."
This case presents a mother and her child who have sought refuge in a domestic violence shelter. The mother reports a chronic pattern of physical, verbal and sexual abuse by an alcoholic, abusing father. The behaviors, which may have occurred in the presence of the child, are episodes of severe masochistic and ritualist sexual abuse which clearly places the child in jeopardy and strongly suggests that the mother's ability to protect this child is not adequate. The child also is medically confirmed to have a history of chronic anal sphincter problems. Two possible causes are noted. One relates to a familiar history of myotonic dystrophy. The second possible cause is that chronic anal dilation and sphincter muscle problems are known consequences of anal sodomy in both adults and children, according to Dr. David Mantell.
Eric arrived at his foster home on August 7, 1995, where he has remained to this date. When he first came to the foster parents, the foster father testified that Eric was scared, soiled his pants a lot, urinated, and was otherwise incontinent for the first month. During this period of time the foster parents believed there was something physically wrong with Eric. The foster parents noted he was afraid of a bathtub at the beginning; he was afraid to have water on his head. He was uneasy with the new people around him. Within a short time thereafter, that is, within one month, his problem of encopresis had ended. Dr. Mantell indicated that for this condition to resolve itself within a month after entering foster care suggests that the problem may have been caused by a lack of bowel training, a stressful environment, and the child experiencing significant emotional relief sufficient to control his bodily functions.
It should be noted that within three weeks of Eric's placement in foster care, he was evaluated individually by Dr. Mantell. Eric had:
 a global developmental quotient of 2.9 at a time when he was actually 4.7 years of age. He had problems with bowel management, concentration, and also evidence of obsessionality with death and dying, restlessness, confusion, talking to himself, staring blankly, and talking about killing. He is reported to wet himself, CT Page 7625 the bed and whine, to threaten, tease, talk excessively, be stubborn, repeat acts, to be poorly coordinated, sometimes shy, and to be demanding, disobedient, and jealous. This is not a happy profile.
The foster father indicated that at present Eric is a very special boy who is helpful around the house and does well in school. Although he should not be in a regular classroom with twenty children or more, in a smaller group he performs well. He needs a great deal of praise and regularly attends kindergarten. His mouth hangs open constantly and he has to be told frequently to close his mouth. It affects his speech. At times he talks clearly and at times the foster parents cannot understand what he is saying. He is regularly attending speech therapy in school. He regularly visits Newington Hospital.
The foster father indicated that after the joint evaluation between Eric and his mother conducted by Dr. Mantell on June 3, 1996, Eric started soiling his pants again for the week after the visit. The foster mother indicated to the social worker that Eric seemed constantly preoccupied but would not talk at all about the meeting with his mother. In Dr. Mantell's report he indicates that at the end of the interview "the child left easily with the foster parents. There was no emotion with the mother. He gave her a passive hug at her request. There was no sense of emotional connection."
The detailed telephone records for Mrs. O which were placed in evidence (respondent's Exh. B) indicate that there are twelve telephone calls which were placed to the foster home from Florida. There have been no visits. Eric has expressed no interest in having a visit, and as of the date of trial there has been no telephone contacts with the parents in over six weeks.
ADJUDICATION
With respect to the statutory grounds for termination of parental rights, the court finds by clear and convincing evidence that the child has been abandoned by the parents in the sense that they have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child in violation of § 17a-112 (b)(1). The fact that the father has made no arrangements for visitation or communications with his son since March 1995 indicates that intention to abandon his son. His conduct clearly supports such a finding. In Re MichaelCT Page 7626M., 29 Conn. App. 112 (1992). Similarly, while the mother has shown some interest as reflected in the telephone calls she has made to Eric, that interest does not rise to the level of a reasonable degree of interest, concern or responsibility as to the welfare of the child. She has not contacted the foster parents to inquire about the child's welfare, schooling, medical condition, counseling and the like. She does not know the names of the teachers or the friends of the child. She has not made any effort to personally visit the child. She has indicated by her conduct that she has a greater interest in maintaining an abusive interpersonal relationship with her husband than she is in parenting her child. Mrs. O clearly made the decision in August of 1995 that she was not inclined to engage in any therapeutic process to address the issues of the neglect of the child, parenting skills, or to resolve the issues of domestic violence in her life. This ground is found to have existed for more than one year.
The court further finds that on January 23, 1996, this court (Potter, J.) found Eric to be neglected. Since the adjudication of neglect, the parents have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, that they could assume a responsible position in the life of this child in violation of § 17a-112 (b)(2).
The court finds that the father has shown no interest in confronting the issues which caused his wife and child to leave him in March 1995. While the wife has indicated to the social workers, to the shelter and to the hospital staff a chronic ritualistic sexual abuse, physical abuse and verbal abuse, her only way of dealing with those issues is now to deny that they ever occurred since she has elected to leave her son in Connecticut and return to her husband in Florida.
As part of her expectations, she and her husband were to participate in individual family counseling with a focus on the neglect to their child and the domestic violence issues that were reported by Mrs. O. They were also expected to visit with Eric. As far as it is known, neither parent every engaged in any sort of therapeutic treatment neither in Florida or in Connecticut.
While Mrs. O was in the various shelters and in the Windham Community Memorial Hospital, she consistently demonstrated a lack of parenting skills. Virtually all of the service agreements and CT Page 7627 resident contracts with Mrs. O required her to change Eric's diapers when needed, to remove and dispose of his diapers promptly, to keep her room sanitized and free of odor and "show for meals." Mrs. O failed to comply with these minimal sanitation requirements, let alone, minimal parental skills. As indicated earlier, Eric was in her care for five years; as soon as he was outside of her care for thirty days he was able to achieve appropriate bowel management. Whatever the horrible cause of his encopresis; anal sodomy, witnessing ritualistic sexual abuse, or inadequate attention by mother to son to teach him this most fundamental and essential training, these parents failed this child in ways which may never be known.
Further, the parents have failed to rehabilitate in that it is the mother's intention, if the child were returned to her, to expose this child to the same dangerous, violent and abusive person and be in a similar position herself of being unable to protect Eric. In Re Felicia D., 35 Conn. App. 490 (1994).
While there is no bright line test of what constitutes reasonable time for parental rehabilitation, it has been ten months since the adjudication of neglect and much more than a year since the parents reunited in Florida. They have demonstrated no positive action on their part through therapeutic intervention or counseling to resolve the enormously dysfunctional aspects of their relationship. The court finds that under the circumstances of this case a reasonable time has elapsed for parental rehabilitation. In Re Davon M., 16 Conn. App. 693
(1988). With respect to the failure to rehabilitate, the court finds from the totality of circumstances that the one year requirement should be waived, the court having considered the best interests of the child, the departure of the parents for Florida and their lack of affirmative action toward rehabilitation.
With respect to the allegations of acts of commission or omission and the allegations related to no ongoing parent-child relationship, the court will dismiss those allegations without prejudice.
DISPOSITION
It is not sufficient to find that grounds for termination exist. The court must also determine, pursuant to § 17a-112 (d), as amended, if a termination of parental rights is in the best CT Page 7628 interests of the child. The court must make this finding by clear and convincing evidence. In re Romance M., 30 Conn. App. 839,847-48 (1993), appeal dismissed, 229 Conn. 345 (1994). See also Practice Book § 1050.1(3).
1. Regarding the nature and timeliness of services offered by the Department of Children and Families, the court finds: Appropriate and timely services were provided by the Department of Children and Families, including counseling, case management, transportation assistance, and visitation coordination. The services provided are more fully set forth in the Social Study which has been placed in evidence. They include placement of mother and child in four different shelters, assistance with medical treatment and evaluation, and therapeutic services for Eric at the Yale Child Study Center for speech treatment. The agency arranged for weekly telephone visitation. Eric is monitored at Newington Children's Hospital for symptoms of myotonic dystrophy.
2. Regarding DCF efforts for reunification pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended, and § 17a-112 (b) of the General Statutes: The court finds by clear and convincing evidence that the Department of Children and Families has made reasonable efforts given the situation and circumstances to reunite the family. It was at all times initially the intention of DCF to reunite the family, but only after therapeutic intervention. The degree of dysfunction in the family was extremely severe. The child's problems were profound. DCF's first goal was to keep the mother and child from an abusive situation. The goal of DCF to reunite was frustrated by the mother and father leaving Connecticut to return to a sado-masochistic lifestyle without obtaining any treatment. In doing so, the parents, at least constructively, abandoned their child. DCF cannot compel people to act in their own best interest, neither can DCF make people into good parents if the parents are not personally motivated to be good parents. The goals of DCF were frustrated through the conduct and attitude of the parents.
3. Regarding court orders, fulfillment of obligations, expectations and service agreements: The Department, with the approval of the Court, set reasonable and realistic expectations to reunify the family. There was only minimal compliance, if any, by the parents. CT Page 7629
The expectations were:
1. Father to enter and complete domestic violence therapy.
2. Mother to enter and complete domestic violence therapy.
3. Father to have no unsupervised visits with mother or son.
4. Eric to be assessed and enter individual therapy if necessary.
5. Mother and father to enter individual therapy.
6. Father to participate in alcohol evaluation and assessment.
7. Parents cooperate with DCF and keep their whereabouts known.
8. Cooperate with all service providers including DCF.
As far as is known, the parents neither entered nor completed, domestic violence, individual or alcohol counseling. They did nothing to deal with the catastrophic dysfunction in their relationship.
4. Regarding significant emotional ties of the child toward parents, relatives, foster parents etc.: The child has strong emotional ties with the foster family that has provided the physical, emotional, moral and educational support this child needs. He has made remarkable personal advancement since his removal from the biological parents. The child has little positive emotional connection to the biological parents.
5. Finding regarding the age of the child: This child is 6 years of age. The child requires stability of placement and continuity of care. The child's Attorney and guardian ad litem, the psychological evaluation, and the social study all recommend a termination of the parental rights.
6. Regarding the parents' efforts to conform their conduct to the best interests of the child, considering contact, conduct, communications and contributions, if any: The parents have not made realistic and sustained efforts to conform their conduct to even minimally acceptable parental standards. Giving them CT Page 7630 additional time would not, in all likelihood, bring their performance, as parents, within acceptable standards sufficient to make it in the best interests of the child to be reunited. Inre Luis C., 210 Conn. 157 (1989); In re Juvenile Appeal
(Docket No. 9489), 183 Conn. 11, 15 (1981). The parents have fled the state, and have not engaged in any positive activity to resolve the problems that brought this family to the attention of the court.
7. Finding regarding the prevention of a parent from having a meaningful relationship etc.: While the parents' means were limited, economic factors did not prevent regular, continuing contact with either the child or the foster family. The decision of the parents to flee Connecticut and to reject counseling was the principle reason for any failure to maintain contact.
Further, the court is mindful of the overwhelming public policy in support of requiring parents to financially support their children. In re Bruce R., 234 Conn. 194 (1995). There has been no showing in this case that the biological parents have the capacity to pay an adequate child support order for that the child's financial interests will be adversely effected by a termination of parental rights. The child's need for safety is paramount to any financial considerations.
ORDER
The court having considered all statutory considerations and having found by clear and convincing evidence that grounds exist for termination of parental rights, further finds upon all of the facts and circumstances presented, that it is in the child's best interest to terminate the parental rights of Dawn O., the biological mother and Thomas O., the biological father. Accordingly, it is ordered that their parental rights to the child, Eric O. are hereby terminated.
It is further ordered that the Commissioner of the Department of Children and Families is hereby appointed the statutory parent for the purpose of securing an adoptive family or other permanent placement for said child and that the Commissioner shall file with the court, no later than ninety (90) days following the date of judgement, a written report toward such permanent placements and file such further reports as are required by state and federal law. CT Page 7631
FOLEY, J.